## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ELIZABETH D. LIPPINCOTT,      : Case No. 3:16-cv-358
                              :
     Plaintiff,          :
                              :
                              : Magistrate Judge Sharon L. Ovington
vs.                           : (by full consent of the parties)
                              :
NANCY A. BERRYHILL,           :
COMMISSIONER OF THE SOCIAL    :
SECURITY ADMINISTRATION,      :
                              :
     Defendant.          :

---

## DECISION AND ENTRY

---

## I.    <u>Introduction</u>

Plaintiff Elizabeth D. Lippincott brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. She applied for benefits on May 14, 2013, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Mark Hockensmith concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Hockensmith's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a "disability" since August 22, 2011. She was thirty-six years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). She has a high school education. *See id.* § 404.1564(b)(4).

### A.    Hearing Testimony

#### i.  Plaintiff

Plaintiff testified at the hearing before ALJ Hockensmith that she sees Shirley Jean Budding, a psychiatric nurse (certified nurse practitioner), at least every three months. (Doc. #6, *PageID* #s 143-44). Ms. Budding manages Plaintiff's depression and anxiety medications. *Id.* at 143. Plaintiff stated that her anxiety is not getting any better and is "probably getting worse." *Id.* She does not like to leave her house and gets nervous in groups of ten or more. *Id.* at 143-44. She no longer sees a counselor because she cannot afford it. *Id.* at 144-45.

Plaintiff's "main physician" is Dr. Valle, a sleep doctor who treats her sleep apnea. *Id.* at 145-47. She sees him every three to six months. *Id.* at 146. Dr. Valle prescribes methamphetamine. *Id.* Plaintiff tells "him the same thing over and over again: the medication is not holding [her] near as long as [she] feel[s] like it should." *Id.* She

estimated that it is effective for three hours. *Id.* at 159. She has sleepiness daily. *Id.* at 154. She estimated that she has two to three good days a week. *Id.*

Plaintiff has a CPAP machine that she is supposed to use while sleeping. *Id.* at 147. She did not use it every night because when she wore the mask, she woke up feeling like she was suffocating. *Id.* She had to take anxiety medicine with Ambien to be able to sleep with the mask on. *Id.* She explained that because "it's been so choppy, as far as using it," she could not say how well it works. *Id.* at 153-54. They have tried several masks and she thinks it has been "a little successful." *Id.* at 148. At the time of the hearing, Plaintiff had just taken her machine to Dr. Valle's office because the settings were messed up. *Id.* She had not set it up yet and was having trouble getting the bucket of water out of it. *Id.*

Plaintiff also sees Dr. Schoonover, a neurologist at the same practice as Dr. Valle. *Id.* He treats her migraines. *Id.* For years, Plaintiff's migraines were pretty well managed. *Id.* However, about six to eight months before the hearing, she started having more problems with them. *Id.* at 148-49. She started losing slight peripheral vision for twenty minutes when she had a migraine. *Id.* at 149. Plaintiff has headaches several times a week and migraines once every couple weeks. *Id.* at 149-50. Dr. Schoonover prescribes Zanaflex. *Id.* at 149. Plaintiff reported, "it makes me feel like I'm flying through the air." *Id.* And, it only works sometimes. *Id.*

Plaintiff sees Dr. Saxe, an internal GI doctor who diagnosed chronic pancreatitis. *Id.* at 150. He also treats her irritable bowel and reflux. *Id.* at 151. She sees him about once per year. *Id.* Plaintiff gets pain in her sternum that radiates outward. *Id.*

Sometimes she is able to "walk and carry on, and still be in pain." *Id*. Other times, she has to lie down on the floor "because I'm in so much pain, I can't even stand." *Id*. Her doctors have done procedures that have helped some. *Id*. at 152. She has an "attack" of severe pain about every three weeks to one month. *Id*. at 151-52. The attacks last for a minute. *Id*. at 152. But, she is "out of commission for … maybe an hour or so … because … I'm just physically worn out after it happens …." *Id*. at 153.

Plaintiff lives in a house with her husband and two children (ages 8 and 11). *Id*. at 124. She has a driver's license and drives short distances—no more than thirty minutes—several times a week. *Id*. at 125-26. She does not drive longer distances because she is afraid that she will get too sleepy while driving. *Id*. at 126. In the past, when she felt tired while driving, she pulled into a parking lot to rest. *Id*.

Plaintiff can "physically" handle personal care activities such as getting dressed and bathing. *Id*. at 154-55. However, "depression makes it hard." *Id*. at 155. She explained that although she did not want to admit it, she does not shower as much as she should. *Id*. Plaintiff's husband does eighty to ninety percent of the cooking. *Id*. He also vacuums because "bending, pulling, pushing motion … seems to aggravate [pancreatitis]. *Id*. at 155-56. Plaintiff tries to help with the general housework as much as she can. *Id*. at 156. For example, she does some laundry. *Id*. However, she sometimes forgets that she put a load in and then it just sits in the washer. *Id*. Plaintiff takes two naps throughout the day, once in the late morning and once in the early afternoon. *Id*. at 157. She naps anywhere from thirty minutes to two hours. *Id*. Other than trying to help around the house and napping, Plaintiff watches TV or is on her computer. *Id*. She

attends her kids' activities when she can. *Id.* at 159. But, sometimes, she cannot because she is tired and depression maker her "feel paralyzed." *Id.* at 160.

Plaintiff has a bachelor's degree in social work. *Id.* at 126. At the time of the hearing, she worked part time for Centerville City Schools. *Id.* at 127. She coordinated teachers with parents who were willing to volunteer. *Id*. Her work is all from home, and she does not volunteer in the classrooms. *Id.* at 127-29. The school gives papers to her son to take home and then Plaintiff emails parents to see who is available. *Id.* at 128. At the beginning of the school year, Plaintiff estimated that she worked five hours a week. *Id.* at 130. At the time of the hearing, because it was the end of the school year, she was not working very much. *Id.* at 128. She received one-thousand dollars for the entire school year. *Id*.

Plaintiff worked at Market Day, a grocery program, for two or three years, ending in March 2015. *Id.* at 127, 130. Although her schedule varied, she averaged around fifteen hours per week. *Id.* at 132. She worked from home part of the time, as the contact person for the chairperson at each school, and then she also visited the schools to help the day of the sale. *Id.* at 131.

Prior to that, she worked at a nursing home where she coordinated discharge planning, set up community resources and home health care, answered insurance questions. *Id.* at 133. She left after she started falling asleep at morning meetings and throughout the day. *Id*. During the time she worked at the nursing home, she was also pursuing an associate's degree in medical billing and coding. *Id.* at 137. She had to take a break from school because she had a nervous breakdown. *Id.* at 138. But, when she

began feeling "a little bit better," she went back and graduated in December 2014. *Id.* She has not been able to use her degree because she has not taken a required certification exam. *Id.* at 139.

### ii. Plaintiff's Mother

Sue Weeks, Plaintiff's mother, also testified at the hearing. When asked what Plaintiff's biggest issues are, she responded, "The word 'lethargic' comes to mind a lot. …" *Id.* at 167. She explained that her daughter had an "inability to function consistently …." *Id.* at 168. Almost every day, Ms. Weeks observes Plaintiff's "tiredness, wanting to nap, forgetfulness, confusion, things like that." *Id.* When Plaintiff is tired, she is not able to focus and it sometimes interferes with her ability to function. *Id.* She has to write down everything because she forgets what she is supposed to do. *Id.* at 169. When asked, "does she have trouble taking care of even just the basic needs of her household, Ms. Weeks responded, "To some degree, yeah. I guess my word would be 'chaos.'" *Id.* at 170. She further explained that Plaintiff takes care of her children but she is "not able to get all the stuff done that I would think you should do …." *Id.* For example, Plaintiff has difficult mornings. And, it is sometimes a "struggle" to get the kids to school in the morning. *Id.* Ms. Weeks indicated that it may because Plaintiff takes a "relatively strong narcotic." *Id.* But when Plaintiff had to go without her medication for "a couple days," "[s]he couldn't function well at all." *Id.* at 171.

## III. <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v.*

*City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term

"disability"—as defined by the Social Security Act—has specialized meaning of limited

scope. It encompasses "any medically determinable physical or mental impairment" that

precludes an applicant from performing a significant paid job—i.e., "substantial gainful

activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at

469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

2007). Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record

contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741

F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to

support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.

Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Hockensmith to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since August 22, 2011.

Step 2:     She has the severe impairments of obstructive sleep apnea (OSA), chronic pancreatitis, affective disorder, anxiety disorder, and narcolepsy.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "work at all exertional levels … with the following additional limitations: (1) only occasional stooping, crouching, kneeling and crawling; (2) no climbing of ladders, ropes and scaffolds; (3) no exposure to hazards such as moving machinery or unprotected heights; (4) no commercial driving; (5) limited to performing simple, routine tasks; (6) no fast paced work or strict

8

production quotas; (7) limited to a static work environment; (8) limited to making simple work related decisions; (9) only occasional interaction with the public and coworkers."

Step 4:     She is unable to perform any of her past relevant work.

Step 5:     She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 98-109). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 109.

**V.     Discussion**

Plaintiff contends that the ALJ erred in finding that Plaintiff's testimony was not credible. She also argues that the ALJ erred by improperly substituting his own opinions as a medical conclusion and in failing to fully consider the vocational expert's entire testimony. The Commissioner maintains that substantial evidence supports the ALJ's assessment of Plaintiff's subjective complaints; his consideration of Nurse Budding's opinions; and his conclusion that Plaintiff could perform other jobs that existed in substantial numbers in the national economy.

**A.     Plaintiff's Credibility**

Plaintiff contends that the ALJ erred in finding that she was "not entirely credible." The Sixth Circuit established the following analysis for evaluating a plaintiff's symptoms:

> First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity,

persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers,* 486 F.3d at 247. When evaluating the intensity, persistence, and limiting effects of a plaintiff's symptoms, Social Security Regulations require the ALJ to consider the following factors: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the plaintiff takes or has taken to alleviate symptoms; treatment, other than medication, the plaintiff receives or has received for relief of symptoms; any measures the plaintiff uses or has used to relieve symptoms; and other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

The ALJ "must then make a finding on the credibility of the individual's statements about symptoms and their functional effects." Soc. Sec. R. 96-7p, 1996 WL 374186, at *4 (Soc. Sec. Admin. July 2, 1996).[1] "Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248 (internal quotation and footnote omitted); *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's

---

[1] The Social Security Administration issued Soc. Sec. R. 16-3p, effective March 16, 2016, which supersedes Soc. Sec. R. 96-7p. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-7p was still in effect.

testimony as incredible, he must clearly state his reasons for doing so.") (citation omitted).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007). However, an ALJ's assessment of credibility must be supported by substantial evidence. *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

The ALJ concluded that Plaintiff's "complaints of disabling symptoms are not fully credible." (Doc. #6, *PageID* #105). The ALJ provided several reasons in support of his credibility determination. He first found that Plaintiff's "assertion that she has not been able to work at any time since the alleged disability onset date is not supported by substantial evidence." *Id.* at 103. He then lists evidence that he thought supported his finding: "Treatment notes indicate the claimant has obstructive sleep apnea and narcolepsy. The evidence of record reveals daytime sleepiness, ptosis eyelids, and a tired/sleepy appearance. The claimant reports excessive daytime sleepiness and fatigue, snoring, and nighttime restlessness. In addition to prescription medication, the claimant has used a CPAP machine, albeit infrequently at best." *Id.* (internal citations omitted). This evidence, however, describes signs and symptoms that tend to confirm Plaintiff's testimony. It was thus unreasonable for the ALJ to rely on such evidence.

The ALJ also notes that she has been noncompliant with her treatment regimen for hypertension and diabetes. *Id.* Plaintiff correctly points out that she does not allege disability based on either of those conditions.

The ALJ proceeds to discuss her noncompliance with her treatment for sleep apnea. *Id.* Specifically, Plaintiff was prescribed and reported using a CPAP machine and nocturnal oxygen to treat sleep apnea. But, her doctor indicated, "I suspect once we treat her apnea she will feel more rested[.]" *Id.* (citing Exhibits 16F [*PageID* #s 945-76] and 19F [*PageID* #s 1060-1105]). The ALJ implies that this note was written after she claimed to be using the CPAP machine. However, it was not. Indeed, in May 2011, Dr. Valle indicated that Plaintiff's "mild very central sleep apnea doesn't require PAP therapy." *Id.* at 544. On July 15, 2013, Plaintiff's sleep was evaluated again and Dr. Valle diagnosed moderate obstructive sleep apnea. *Id.* at 832. Based on those results, on August 7, 2013, Dr. Valle instructed Plaintiff to schedule a CPAP titration study. *Id.* at 956. On the same day, after noting that she reported that she was still struggling with daytime sleepiness despite her medication, Dr. Valle stated (in full), "She still wishes that it would work better for her and I suspect once we treat her apnea she will feel more rested." *Id.* at 955. On September 14, 2013, Plaintiff underwent the CPAP titration study to calibrate a CPAP machine. *Id.* at 948. Dr. Valle's statement concerning the treatment of Plaintiff's sleep apnea occurred *before* Plaintiff was prescribed a CPAP machine.

The ALJ also overlooks that Plaintiff had difficulty affording a CPAP machine. In February 2014, Dr. Valle noted that she "did give the CPAP a trial, but unfortunately stopped it because she had a 60-dollar co-pay, which she said that she was no longer able

to afford." *Id.* at 946. Dr. Valle indicated in June 2014, "She has not been able to get her CPAP machine. It all comes down to dollars and cents. She cannot afford to pay the monthly rental charge for 15 months, nor can she afford to buy a machine outright. We talked about this at length today. She says she can afford most of her medications but certainly not all of them." *Id.* at 945. He told her that his office would see if they could find a used machine that someone donated back. *Id.*

Although it is appropriate to consider an individual's failure to follow a prescribed treatment, the Social Security Administration has set forth four conditions that must all be met before an ALJ can find that an individual failed to follow prescribed treatment:

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity …; and
2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

Soc. Sec. R. 82-59, 1982 WL 31384, at *1 (Soc. Sec. Admin. 1982). And, if those conditions are met, the ALJ must consider whether the individual's failure was justifiable. *Id.*

There is no indication the ALJ addressed all four conditions set forth above, and to the extent that he did, there is no indication that he considered Plaintiff's reasons for not using the machine. This constitutes error: "The record must reflect as clearly and

accurately as possible the claimant's … reason(s) for failing to follow the prescribed treatment." *Id.* at *2.

The ALJ then points out that Plaintiff testified that she naps for between thirty minutes and three hours despite her doctor advising her to limit her naps to less than twenty minutes. (Doc. #6, *PageID* #103) (citation omitted). The ALJ is correct that Plaintiff's doctor, at one point, advised her to take shorter naps. Specifically, in May 2011, Dr. Valle noted that Plaintiff "has been managing her sleepiness with brief naps during the day which can be restorative for her, which is rather typical of narcolepsy." *Id.* at 543. Plaintiff reported in June 2011that short naps are restorative and long naps cause increased fatigue. *Id.* at 542. Accordingly, she was "instructed to try to take a less than 20 minute nap daily as that appears to be restorative to her. *Id.* There is no further discussion regarding the length of her naps in the remaining notes from Dr. Valle. And, both notes in the record occurred before Plaintiff's alleged disability onset date (August 22, 2011). Accordingly, it was not reasonable for the ALJ to rely on her longer naps four years later to discount her credibility.

And, the ALJ accurately observed that despite Plaintiff's doctor recommending weight loss, she gained weight. *Id.* at 103 (citation omitted). In May 2011, for instance, Dr. Valle noted that "[a] little weight loss would probably help with [her mild very central sleep apnea]." *Id.* at 544. He also indicated in May 2013, "We recommended that she work on weight loss to treat the mild apnea; however, she was not successful in doing so and has since gained 10 pounds." *Id.* at 833.

However, the ALJ does not acknowledge that in February 2014, Dr. Valle noted, "She did have associated weight gain with these medications and feels that since she has been off of them she has been losing weight." *Id.* at 946. And, medical records from Dayton Gastroenterology support Plaintiff's statement. In April 2013, Plaintiff weighed 197 pounds. *Id.* at 816. By April 2014, she weighed 185 pounds—a loss of 12 pounds. *Id.* at 874. Plaintiff did, however, gain the weight back. At the hearing, she testified that she weighed 212 pounds. Nonetheless, Plaintiff's weight gain was not a failure to follow a prescribed treatment—only Dr. Valle's recommendation. *See Harris v. Heckler*, 756 F.2d 431, 436 (6th Cir. 1985) ("the dissent is incorrect in characterizing the physicians' recommendations as a prescribed course of treatment. Rather, they should more properly be viewed as a suggested course of treatment since there is no evidence that [the plaintiff] was ever ordered by any of his physicians … to lose weight. We therefore reject the dissent's implication that [the plaintiff's] failure to change these habits constituted a willful failure to follow prescribed treatment.") (citing *Fraley v. Sec'y of Health & Human Servs.,* 733 F.2d 437, 440 (6th Cir. 1984); *Perkins v. R.R. Ret. Bd.,* 725 F.2d 46 (6th Cir. 1984); *Young v. Califano,* 633 F.2d 469, 472-73 (6th Cir.1980)).

The ALJ further discounted Plaintiff's credibility by finding her own statements to be inconsistent. He notes Plaintiff testified that she stopped working at Heartland of Centerville because she could not stay awake at work. By comparison, "she reported to her psychiatrist that she quit working due to anxiety triggered by job situations, demands of leadership, crisis management and responsibilities, and unpredictable episodes of chronic pancreatitis[.]" (Doc. #6, *PageID* #104) (citation omitted). Additionally,

Plaintiff testified that she had two to three good days a week but "never indicated to her treatment provider that she had 'good' and 'bad' days." *Id.*

There are several holes in the ALJ's findings. The psychiatric progress note from September 7, 2011, indicates that Plaintiff reported quitting her job three weeks before "due to a combo of depression/anxiety and pain. States [she] has *good days/bad days* but [symptoms] are unpredictable." *Id.* at 1055 (emphasis added). On November 2, 2011, Plaintiff's psychiatrist indicates that she quit because of "anxiety triggered by job situation – demands of leadership, crisis management responsibilities, unpredictable episodes of pain …." *Id.* at 1054. This is not inconsistent with Plaintiff's testimony. Plaintiff being written up for sleeping during meetings illustrates problems with supervisors and sleeping at, for example, a nurse's station, during work certainly restricts her ability to fulfill her responsibilities. *See id.* at 133-34 (Sleeping at work "wasn't productive. It wasn't good for my job. It wasn't good for the people that I was working for ….").

The ALJ also observed: (1) On June 8, 2011, she reported she was doing well at work and was not falling asleep; (2) on February 6, 2013, Plaintiff again reported that she was functioning very well during the day while taking the methamphetamine; and (3) on June 12, 2014, Plaintiff indicated that methamphetamine works well for her sleepiness. *Id.* (citations omitted).

These statements, however, do not identify substantial evidence in support of his conclusion that Plaintiff is not credible. "[A] substantiality of evidence evaluation does not permit a selective reading of the record. 'Substantiality of the evidence must be

16

based upon the record taken as a whole.  Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  *Brooks v. Comm'r of Soc. Sec*., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)) (internal citations and quotation marks omitted).

The statement from June 2011 occurred before Plaintiff's alleged disability onset date.  And, although Plaintiff stated that she was not falling asleep at work, she also said that she "does feel somewhat sleepy throughout the day."  (Doc. #6, *PageID* #541).  Her statement in February 2013 is an isolated instance when Plaintiff reported doing well— one of very few.  In contrast, at her appointment on December 19, 2012, Plaintiff reported that she was not happy with how the methamphetamine was working in the afternoon.  *Id.* at 836.  Additionally, "her kids tell her that all she does is sleep all the time [and] [s]he feels very run down in the late afternoons."  *Id.*  On May 6, 2013, Plaintiff reported that the methamphetamine was beneficial but she still has to take a nap every afternoon.  *Id.* at 833.  On February 19, 2014, she reported that methamphetamine 15 mg twice a day helps with her daytime sleepiness but she still experienced daytime fatigue.  *Id.* at 946.  Then, as the ALJ recognized, Dr. Valle noted on June 12, 2014, "Methamphetamine 5 mg 3 pills b.i.d. works well for her sleepiness."  *Id.* at 104 (citations omitted).

The ALJ next acknowledges that Plaintiff has a history of pancreatitis.  He finds that one-minute attacks of abdominal pain once every three weeks to one month "cannot

support a finding of disability." *Id.* He also emphasizes that she did not report the attacks to her treatment provider and "in April of 2014, [Plaintiff] reported to her specialist for this condition that she stopped taking pain medication, has done fairly well over the year, and rarely has abdominal cramping. At that time, [she] had not seen this specialist since 2011." *Id.* The ALJ concluded that Plaintiff's "failure to attend treatment during this period suggests [her] symptoms were not as severe as she alleged." *Id.*

The ALJ's summary of the facts is not entirely accurate. The ALJ is correct that Plaintiff testified that the severe pain lasted a minute. She also, however, testified, "sometimes I'll even – it'll be so bad that if – when I get up afterwards, that … I feel like I've ran through a marathon. I mean, I'm out of breath. And I feel like somebody's punched me in my gut. I mean, I feel real tender. …" *Id.* at 152. And after the attack, "I'm out of commission for, you know, maybe an hour or so – because it just – like I said, you know, I have that just worn out. I'm just physically worn out after it happens, after that minute of pain." *Id.* at 153.

Additionally, Plaintiff returned to Dayton Gastroenterology in April 2013. *Id.* at 814. At that time, her treatment provider noted that she had not been treated by their office since 2011. *Id.* And, "Since that time, she has weaned herself off of any narcotics, after being seen by pain physician but did not like this. She has dealt with the pain by distraction, warm compresses, and occasional Aleve. She continues to have some nausea, several mornings per week, often will be able to get by without taking Zofran, but still needs it on occasions. …" *Id.* Plaintiff then returned again on April 2, 2014. *Id.* at 873.

Dr. Saxe indicated, "her chronic abdominal pain is at baseline. She *rarely* has abdominal cramping. …" *Id.* (emphasis added).

The ALJ does not seem to consider that Plaintiff received treatment for abdominal pain from several other physicians. For instance, between January 2010 and September 2011, Plaintiff consistently saw Dr. Donnini, a pain specialist, for abdominal pain. *Id.* at 726-76. And, between October 2011 and November 2012, Plaintiff saw a pain specialist eleven times (averaging almost once per month) for her "chronic abdominal pain." *See id.* at 977-1016. She testified, moreover, that after she stopped treatment at the pain clinic, Dr. McCarthy, her primary-care physician, agreed to prescribe pain medication for abdominal pain when needed. *Id.* at 142. Together, this evidence shows that there was no gap in her treatment of abdominal pain.

The ALJ then turned his attention to Plaintiff's mental conditions, concluding that her assertion of disabling mental symptoms is not supported by objective medical evidence. Yet, as the ALJ did with physical symptoms, he listed evidence that supports Plaintiff's allegations:

> Treatment notes indicate the claimant suffers from an affective disorder and anxiety disorder. The claimant exhibits a constricted affect, anxiety, confusion, remote memory deficits, diminished concentration, attention and focus, limited social interaction and adaptation, low stress tolerance, anxious and/or depressed mood, and a tendency toward self-isolation and being overwhelmed. The claimant alleges anxiety, depression, worry, crying spells, withdrawal, anhedonia, poor appetite, low energy, agitation, racing thoughts, impulsive behavior, paranoid-like thinking, sadness, stress, and panic attacks. She is prescribed medication for this condition and has attended individual counseling in the past.

*Id.* at 104-05 (internal citations omitted).

The ALJ also attacked Plaintiff's credibility based on the fact that she had only received limited mental health treatment. He noted that she sees a certified nurse practitioner for pharmaceutical management but has not sought individual counseling.

Ruling 96-7p explains, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment...." 1996 WL 374186, at *7. In the present case, the ALJ did not consider Plaintiff's testimony that she is not seeing a counselor because she cannot afford the co-pay. (Doc. #6, *PageID* #s 144-45). Her difficulty affording medication is noted throughout the record. *See id.* at 890, 946. Yet, the ALJ makes no mention of it. The record also shows that Plaintiff has sought counseling—presumably when she is able to afford it. For example, she attended counseling with Stephanie Hittle, MS, LPCC, from March 2012 to October 2012. *Id.* at 1132-53.

The ALJ also found that Plaintiff's testimony was inconsistent with other statements she made. For example, Plaintiff testified that she showers less because of her depression. *Id.* at 105, 155. But, according to the ALJ, in her Function Report, Plaintiff check the box indicating that she had no problems with personal care, including bathing and dressing. *Id.* at 105 (citation omitted). This overlooks ignores two significant facts. First, Plaintiff completed the Function Report on August 7, 2013 and

testified almost two years later, on April 15, 2015.  *Id.* at 116, 390.  Second, when asked, "Any issues with getting yourself dressed, bathing, just sort of general grooming and getting yourself together during the day?" Plaintiff testified, "*No.  I can physically do those things.  The depression makes it hard.  I really don't want to admit this in front of everyone, but it – the depression makes it -- I don't know.  It sounds stupid.  I don't, you know, probably don't shower as much as I should.*"  *Id.* at 154-55 (emphasis added).

The ALJ also points to a supposed difference between Plaintiff's testimony that her husband does most of the grocery shopping, and her indication in the function report that she goes to the store once per week.  *Id.* at 105, 155.  Again, the ALJ incorrectly states the facts.  Plaintiff indicated that she shops in stores and by computer.  *Id.* at 386.  She shops for groceries, household items, toys, and clothes.  *Id.*  And, when asked, "How often do you shop and how long does it take?" she responded, "Once a week or less; depends upon how tired I am, if someone goes with me, etc."  *Id.*  In addition, Plaintiff testified that her husband goes grocery shopping, and "I try and go when I can."  *Id.* at 155.  She also explained, "It takes every ounce of energy I have to go grocery shopping …."  *Id.* at 144.  These statements are not inconsistent.  Thus, substantial evidence does not support the ALJ's conclusion that "[her] information may not be entirely reliable."

The ALJ further reduced Plaintiff's credibility by finding that her description of her daily activities was inconsistent with her reports of disabling symptoms and limitations.  *Id.* at 105.  In support, the ALJ notes that Plaintiff "admits she performs personal care, performs light household chores, drives a car, and goes grocery shopping.  In addition, she cares for her children, is involved with daughter's school, watches

television, listens to music, uses a computer, attends her children's events, and visits with friends." *Id.* (citation omitted). He concluded, "The performance of such activities on a regular and continuing basis indicates that the claimant's level of pain, anxiety and depression does not seriously interfere with her ability to maintain attention and concentration, perform routine tasks, understand and follow simple instructions, and interact with others." *Id.*

In summarizing Plaintiff's activities, the ALJ selectively picked facts from both function reports and the hearing that support his conclusion while ignoring essential facts from those same sources that do not. In doing so, the ALJ has gone far past merely weighing the evidence. *See Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004) ("[The ALJ] may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision.").

As explained in more detail above, the ALJ's mischaracterized Plaintiff's description of her personal care and grocery shopping. Similarly, although Plaintiff testified that she is able to drive, she explained that she does not drive anywhere further than thirty minutes away because she gets tired while driving, and the couple times it has happened, she had to pull into a parking lot to rest before she could continue her drive. (Doc. #6, *PageID* #s 125-26). In March 2012, Dr. Valle indicated that Plaintiff's medication helped, "but in the afternoon she becomes sleepy such that she really should not be operating a motor vehicle; we discussed this today." *Id.* at 847. Similarly, Plaintiff reported that she tries to go to her children's activities—as much as she can. *Id.* at 159. She explained that if she goes to baseball games, she sits away from other people

so she is not embarrassed if she falls asleep.  *Id.* at 159-60.  And, she is not able to attend all of her children's activities:  "there are times where … I just cannot go out.  I feel paralyzed. …"  *Id.* at 160.

The ALJ further found that Plaintiff's presentation and demeanor at the hearing was inconsistent with her allegations of disabling symptoms:  "The claimant was able to closely and fully attend the hearing proceedings.  She sat throughout the entire hearing, appeared to have no difficulty sitting or rising, and did not appear to be in pain or any other distress.  The claimant also attended the hearing without the use of an ambulation aid."  *Id.* at 105.  Plaintiff contends that her "alleged disability is fundamentally based upon narcolepsy and obstructive sleep apnea—not musculoskeletal complaints."  (Doc. #10, *PageID* #1287).  The Commissioner finds Plaintiff's argument odd because she "apparently [forgot] she had alleged disability, in part, due to pain from chronic pancreatitis and other lower abdominal pain."  (Doc. #13, *PageID* #1304) (citation omitted).

Plaintiff did not allege that she has constant debilitating abdominal pain that prevents her from ever moving.  Rather, she testified that she has severe pain every three weeks to one month, and it lasts one minute.  But, as a result of the pain, she is physically worn out for about an hour.  It is not reasonable to connect Plaintiff's lack of pain indication during the hearing to a conclusion that she does not suffer the severe pain she described.  Further, even if she experienced severe pain at the hearing, there is no indication that she would have difficulty sitting or rising or need an ambulation aid.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[2]

## B.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041. The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[2] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Elizabeth D. Lippincott was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

Date:  September 22, 2017                 *s/Sharon L. Ovington*
                                                      Sharon L. Ovington
                                                      United States Magistrate Judge